ORIGINAL

Reed Zars
Wyo. Bar No. 6-3224
Attorney at Law
910 Kearney Street
Laramie, WY 82070
(307) 745-7979
reed@zarslaw.com
*Attorney for Plaintiffs*

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2015 SEP 29   AM 10 38

STEPHAN HARRIS, CLERK
CHEYENNE

[additional counsel, pending admission *pro hac vice,*
listed on signature page]

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT; NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION; NATURAL RESOURCES DEFENSE COUNCIL, INC.; PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC.; and CENTER FOR FOOD SAFETY, ) ) ) ) ) ) | Civil No. *15-cv-169* **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

WESTERN WATERSHEDS PROJECT; NATIONAL )
PRESS PHOTOGRAPHERS ASSOCIATION;      )
NATURAL RESOURCES DEFENSE COUNCIL, INC.; )
PEOPLE FOR THE ETHICAL TREATMENT OF   )
ANIMALS, INC.; and CENTER FOR FOOD SAFETY, )
                                      )
        *Plaintiffs*                )
                                      )
        v.                         )
                                      )
PETER K. MICHAEL, in his official capacity as )
Attorney General of Wyoming; TODD PARFITT, )
in his official capacity as Director of the Wyoming )
Department of Environmental Quality;   )
PATRICK J. LEBRUN, in his official capacity as )
County Attorney of Fremont County, Wyoming; )
JOSHUA SMITH, in his official capacity as County )
Attorney of Lincoln County, Wyoming;  )
CLAY KAINER, in his official capacity as County and )
Prosecuting Attorney of Sublette County, Wyoming; )
MATT MEAD, in his official capacity as Governor of )
Wyoming,                              )
                                      )
        *Defendants.*               )
_____ )

Civil No. *15-cv-169*

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

1.      In 2015, the Wyoming Legislature passed two unconstitutional bills,

codified at Wyoming Statutes § 6-3-414 and § 40-26-101, to prevent private citizens and

citizen groups from discovering harmful practices and conditions on federal, state, and

private property, and communicating evidence of those practices and conditions to the

appropriate federal and state authorities. These laws, referred to here as the Data

Censorship Statutes, impose criminal and civil liability on persons who enter open

public or private land without specific permission to collect "resource data"—whether

it be pictures of noxious weeds, samples of polluted water, videos of injured animals, or

even notes on the landscape—and then communicate that data to a federal or state

government agency.

2.      Wyoming's Data Censorship Statutes suppress and punish expressive

activity—including particularly citizens' communication of resource data to their

government—in violation of both the Petition Clause and the Free Speech Clause of the

First Amendment. The Statutes target groups and individuals that hold beliefs

unpopular with the Wyoming Legislature, in violation of the Equal Protection Clause of

the Fourteenth Amendment. And the Statutes substantially interfere with federal

environmental and administrative law in violation of the U.S. Constitution's Supremacy

Clause. Plaintiffs have no choice but to sue to invalidate these Statutes, because the laws

are aimed directly at Plaintiffs' and their members' constitutionally protected activities.

3.     Although the Data Censorship Statutes are clothed in the language of anti-trespass statutes, they have little in common with Wyoming's traditional trespass laws. *Compare* Wyo. Stat. §§ 6-3-414, 40-26-101, *with* Wyo. Stat. § 6-3-303 (preexisting criminal trespass statute); *Salisbury Livestock Co. v. Colo. Cent. Credit Union*, 793 P.2d 470, 473 & n.1 (Wyo. 1990); *R.O. Corp. v. John H. Bell Iron Mountain Ranch Co.*, 781 P.2d 910, 912 (Wyo. 1989). The Data Censorship Statutes punish even *authorized* entry onto public land, if the entrant does not have specific permission to collect resource data. Wyo. Stat. §§ 6-3-414(a), 40-26-101(a). They penalize even *mistaken* entry onto private land, although Wyoming's longstanding trespass statute does not. *Cf.* Wyo. Stat. § 6-3-303. And they prohibit unauthorized entry onto public and private land to collect resource data *only* if that data is "submitted or intended to be submitted" to a government agency. *Id.* §§ 6-3-414(d)(i). Thus, the Data Censorship Statutes do not punish individuals for unauthorized entry *per se*. They instead single out for punishment citizens who enter land without specific authorization to collect resource data, where the citizens intend to communicate that data to government authorities, or the data are otherwise submitted to those authorities.

4.     The Wyoming Legislature was not coy about its purposes. The Data Censorship Statutes were enacted after Wyoming livestock interests sued Western Watersheds Project, a plaintiff in this case, for allegedly trespassing while collecting water quality samples. Western Watersheds had collected data that revealed potentially

2

unlawful water pollution and federal grazing permit violations, and had given that data

to the government. Relying on Western Watersheds' data, the Wyoming Department of

Environmental Quality had in 2012 included three streams on a list of waterbodies that

violate state water quality standards. In response, and at the urging of the livestock

industry, the Wyoming Legislature enacted the Data Censorship Statutes for the specific

purpose of deterring and punishing persons who gather such environmental data

without express authorization, if the data is (or is intended to be) reported to lawful

authorities.

  5.  The First Amendment to the U.S. Constitution does not allow any state to

directly restrict expression in this manner. Preventing Americans from communicating

with their government is not an interest that the Constitution recognizes as legitimate.

  6.  The Petition Clause of the First Amendment singles out for particular

protection communication by citizens with their government. Indeed, the right of

citizens to petition the government is "among the most precious of the liberties

safeguarded by the Bill of Rights," *United Mine Workers of Am., Dist. 12 v. Illinois State

Bar Ass'n*, 389 U.S. 217, 222 (1967). "'[E]xcept in the most extreme circumstances,'"

citizens' exercise of that right "'cannot be punished . . . without violating those

fundamental principles of liberty and justice which lie at the base of all civil and

political institutions.'" *Mercatus Group, LLC v. Lake Forest Hosp.*, 641 F.3d 834, 846 (7th

Cir. 2011) (quoting *McDonald v. Smith*, 472 U.S. 479, 486 (1985) (Brennan, J., concurring)).

This is so because "[t]he very idea of a government, republican in form, implies a right on the part of its citizens . . . to petition for a redress of grievances." *De Jonge v. Oregon,* 299 U.S. 353, 364 (1937) (internal quotation marks omitted).

7.     Wyoming's decision to punish communications between Americans and their government is particularly invidious because the Data Censorship Statutes target communications based both on content (the communication must concern resource data and be directed to the government) and viewpoint (the communication is objectionable to the landowner). The First Amendment's Speech Clause generally does not permit the government to regulate speech based on the subject of the communication, *Reed v. Town of Gilbert,* 135 S. Ct. 2218, 2226 (2015), let alone "based on hostility . . . towards the underlying message expressed," *R.A.V. v. City of St. Paul,* 505 U.S. 377, 386 (1992). Yet that is what Wyoming has attempted to do.

8.     Wyoming's adoption of the Data Censorship Statutes was motivated, at least in significant part, by the Wyoming Legislature's animus toward groups that, during the legislative debates, various legislators referred to as "activist[s]," "extremists," "nefarious," and "evil." One senator referred to the "incident" that prompted the legislation as an "attack on property rights" by "a group of people that don't necessarily see [things] the same way." The legislature's decision to single out for punishment groups whose views the Legislature dislikes violates the Equal Protection Clause of the Fourteenth Amendment.

4

9.     The Data Censorship Statutes not only obstruct the ability of Americans to collect and communicate such resource data to government agencies, they also require government agencies to ignore—and in some cases, to expunge—resource data that a member of the public or the media has collected from open land in Wyoming without express authorization. The Statutes are thus designed both to truncate public involvement and to require government agencies to act in ignorance. This result would directly undermine the implementation of federal environmental law, which depends, in part, on the ability of Americans to communicate information about land and land use to government agencies, and on the power of government agencies to consider and appropriately rely on such data. For example, the Clean Water Act and its regulations requires federal and state implementing agencies to consider data submitted by citizen scientists that identify impaired waterways, 40 C.F.R. § 130.7(b)(5)(iii); *see generally* 33 U.S.C. § 1313(d), or that concern a discharge permit, 40 C.F.R. §§ 124.12(c), 124.14(b). Similarly, the Endangered Species Act, 16 U.S.C. § 1533(b)(3)(A), the Federal Land Policy and Management Act, 43 U.S.C. §§ 1712(f), 1739, the National Forest Management Act, 16 U.S.C. § 1604(d), 36 C.F.R. §§ 218.5, 218.24, 218.25, and the National Environmental Policy Act, 42 U.S.C. § 4332; 40 C.F.R. § 1503.1(a)(3), encourage public submission of data to government agencies and require those agencies to consider and evaluate data submitted by the public. The give and take of information between citizens and government officials is so fundamental to administrative law that

5

it is a key requirement of the Administrative Procedure Act. 5 U.S.C. § 553(c). The Data Censorship Statutes substantially interfere with the accomplishment of these federal environmental and administrative laws. Accordingly, the Data Censorship Statutes are preempted by the Supremacy Clause of the U.S. Constitution. *See* U.S. Const., art. VI, cl. 2.

10.     The impact of Wyoming's Data Censorship Statutes on Plaintiffs is serious. The Statutes are aimed directly at Plaintiffs, and place Plaintiffs and their members in jeopardy for acting to protect public health, the environment, and animal welfare, as well as for informing public debate and governmental decisionmaking on issues of considerable public concern. Plaintiffs and their members collect and publicly report data on environmental conditions and misconduct, animal cruelty and abuse, and land use and misuse. Plaintiffs wish to continue such data collection and public reporting. The Data Censorship Statutes are designed to deter them from doing so.

11.     The Data Censorship Statutes threaten punishment even of citizens who intend to comply fully with the law. The Statutes apply to all Wyoming land beyond town and city boundaries; to public as well as to private property; to park land as well as to rural yards; and to unfenced forests as well as to posted ranges. And the Statutes apply to any American who crosses a property boundary on such lands without permission, even if inadvertently, if the individual intends to gather resource data for submission to the government.

6

12. Wyoming is a big state, and much of it is federal public land. Property lines are frequently unmarked. As the U.S. Court of Appeals for the Tenth Circuit recently recognized, there are areas in Wyoming that are "a jumble of federal, private, and state land," where there are "no fences, cattle, notice of private property, or other postings." *Wyoming v. Livingston*, 443 F.3d 1211, 1215 (10th Cir. 2006). In some instances, it has been necessary to conduct a survey to determine where a road right-of-way ends and private land begins. *Id.* at 1216, 1229.

13. Plaintiffs cannot take the risk that they will be prosecuted or sued under the Data Censorship Statutes for collecting and reporting data that they believe they can lawfully collect. The U.S. Constitution does not permit Wyoming to criminalize and punish such conduct. Because the Data Censorship Statutes are unconstitutional both facially and as applied to Plaintiffs, Plaintiffs respectfully ask this Court to declare the Statutes void and to enjoin their enforcement.

### Jurisdiction and Venue

14. This action arises under the U.S. Constitution, including the Free Speech and Petition Clauses of the First Amendment to the U.S. Constitution; the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the U.S. Constitution; and the Supremacy Clause of the U.S. Constitution. This action also arises under federal statutes and regulations, including 42 U.S.C. §§ 1983 and 1988; the Clean Water Act and implementing regulations, 33 U.S.C. § 1313(d), 40 C.F.R. § 130.7(b)(5)(iii), 40 C.F.R.

§§ 124.12(c), 124.14(b); the Endangered Species Act, 16 U.S.C. § 1533(b)(3)(A); the

Federal Land Policy and Management Act, 43 U.S.C. §§ 1712(f), 1739; the National

Forest Management Act, 16 U.S.C. § 1604(d), and implementing regulations, 36 C.F.R.

§§ 218.5, 218.24, 218.25; the National Environmental Policy Act, 42 U.S.C. § 4332, and

implementing regulations, 40 C.F.R. § 1503.1(a)(3); and the Administrative Procedure

Act, 5 U.S.C. § 553(c). This action also arises under the Court's inherent equitable

jurisdiction.

15.     This Court has jurisdiction over the subject matter of this action pursuant

to 28 U.S.C. § 1331 and 28 U.S.C. § 1343. This Court may award Plaintiffs declaratory

and injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02,

and this Court's inherent equitable jurisdiction.

16.     Venue is proper in the U.S. District Court for the District of Wyoming

pursuant to 28 U.S.C. § 1391(b). Each Defendant resides in this judicial district. This

action challenges the constitutionality of a statute enacted in, and that (if valid) would

apply in, this judicial district.

## Plaintiffs

### Western Watersheds Project

17.     Western Watersheds Project (Western Watersheds) is a non-profit

conservation group, founded to protect and restore western watersheds and wildlife

through education, public policy, and litigation. Western Watersheds has

approximately 90 members in Wyoming, with field offices in Wyoming and in other states. Western Watersheds works to improve public land management throughout the western United States, with a primary focus on the negative impacts of livestock grazing on 250 million acres of western public land, including negative impacts to ecological, biological, cultural, historic, archaeological, and scenic resources. Western Watersheds undertakes investigative work, such as collection of water samples, to document harms from livestock grazing on public land. Western Watersheds has been accused of trespassing to collect such data in Fremont Lincoln, and Sublette Counties. Some investigatory work that the group has undertaken in the past, and would like to undertake in the future would be unlawful under Wyoming Statutes § 6-3-414 and § 40-26-101, although it is not unlawful under pre-existing Wyoming trespass law. Western Watersheds, its staff, and its members would continue this work but for their fear of criminal and civil liability under the Data Censorship Statutes.

18.     For approximately a decade before the Data Censorship Statutes were enacted, Western Watersheds has been collecting water quality data on streams throughout Wyoming, including data on streams within Fremont, Lincoln, and Sublette Counties. Western Watersheds submitted such data to the Wyoming Department of Environmental Quality (DEQ) for the purposes of listing Impaired Waters under the Clean Water Act. Western Watersheds' data collection included measurements of *E. coli,* pH, turbidity, dissolved oxygen, and conductivity. Western Watersheds' data collection

uncovered high levels of *E. coli* contamination caused by livestock grazing on public land. Federal law requires DEQ to review the water quality of Wyoming waterways every two years and to solicit public input as part of its review. DEQ has accepted comments, including from Western Watersheds, pursuant to its 2014 review. Since the Data Censorship Statutes went into effect, however, Western Watersheds has had to cease its water quality data collection in many locations within Wyoming, including locations within Fremont, Lincoln, and Sublette Counties, for fear of criminal prosecution and civil liability. Western Watersheds is precluded from collection of this data until such time as the Data Censorship Statutes are overturned. This will significantly impair Western Watersheds' ability to participate in DEQ's biannual review of water quality, including its participation in DEQ's 2016 review of state water quality.

19.     For about thirteen years before enactment of the Data Censorship Statutes, Western Watersheds collected a wide range of resource data related to the Bureau of Land Management's implementation of the Federal Land Policy and Management Act, 43 U.S.C. §§ 1701-1787. These activities occurred across the state of Wyoming, including in Fremont, Lincoln, and Sublette Counties. For example, Western Watersheds collected data related to: compliance with permit terms and conditions, trespass of livestock on public land, failure of private persons to comply with range improvement cooperative agreements, and upland and riparian use and impacts monitoring. Western Watersheds

communicated such data to the Bureau of Land Management to inform that agency's

rangeland program administration, Rangeland Health Determinations, and permit

renewal analysis processes. The Bureau accepts such public comments pursuant to its

obligations under the Federal Land Policy and Management Act and the National

Environmental Policy Act, 42 U.S.C. §§ 4321-4370h. However, since Wyoming enacted

the Data Censorship Statutes, Western Watersheds has had to cease resource data

collection related to the Bureau of Land Management's implementation of these federal

statutes in Wyoming for fear of criminal prosecution and civil liability. This has

impaired Western Watersheds' ability to participate in decisions the Bureau of Land

Management makes pursuant to the Federal Land Policy and Management Act and

related National Environmental Policy Act processes, including Western Watersheds'

ability to participate in the Bureau's upcoming process to consider renewal of grazing

permits in the Granite Mountain Common allotment, which is in Fremont County, and

the Slate Creek allotment, which is in Lincoln County.

20.     For about thirteen years before enactment of the Data Censorship Statutes,

Western Watersheds collected a wide range of resource data related to the U.S. Forest

Service's implementation of the National Forest Management Act, 16 U.S.C. §§ 1600-

1687. For example, Western Watersheds collected data related to: compliance with

permit terms and conditions, trespass of livestock on public land, failure of private

persons to comply with range improvement maintenance requirements, and upland

11

and riparian use and impacts monitoring. Western Watersheds submitted such data to the Forest Service to inform that agency's rangeland program administration and permit renewal analysis processes. The Forest Service accepts such public comments pursuant to its obligations under the National Forest Management Act and the National Environmental Policy Act. However, since Wyoming enacted the Data Censorship Statutes, Western Watersheds has had to cease resource data collection related to the Forest Service's implementation of these federal statutes in Wyoming for fear of criminal prosecution and civil liability. This has impaired Western Watersheds' ability to participate in decisions the Forest Service makes pursuant to the National Forest Management Act and related National Environmental Policy Act processes, including Western Watersheds' ability to participate in the Forest Service's upcoming process to consider renewal of grazing permits in the Upper Green allotment, which is in Sublette County.

21.     Western Watersheds has been, and continues to be, injured by the Data Censorship Statutes because the Statutes thwart Western Watersheds' intent, and have forced Western Watersheds to cancel plans, to enter public land in Wyoming without obtaining prior, written or verbal permission from the landowner, for the purpose of collecting resource data to submit to state and federal agencies. But for the threat of criminal prosecution and civil liability under these Statutes, Western Watersheds would follow through with its plans to collect such data. Only if these Statutes are struck

down, and enforcement against Western Watersheds is enjoined, will the Statutes'

injurious effect on Western Watersheds be redressed.

22.     Western Watersheds also has been, and continues to be, injured by the

Data Censorship Statutes because the Statutes have thwarted Western Watersheds'

intent, and have blocked Western Watersheds' past and future plans, to collect resource

data for admission as evidence in administrative proceedings before the Wyoming

Department of Environmental Quality regarding impaired surface waters. But for the

Statutes' purported bar on the admission of such evidence in administrative

proceedings, and the Statutes' requirement that government entities expunge such data

from their files, Western Watersheds would follow through with its plans to collect such

evidence. The Statutes' injuries to Western Watersheds will be redressed only if the

Statutes are struck down, and if the Wyoming Department of Environmental Quality is

enjoined from refusing to admit into evidence and expunging from its files resource

data collected by Western Watersheds.

## National Press Photographers Association

23.     Plaintiff National Press Photographers Association (NPPA) is a non-profit

organization that represents journalists who photograph and record subjects of public

interest, including the environment, food safety, and land use activities. NPPA

members record videos and take photographs related to these subjects in Wyoming,

and some of NPPA's members live and work in Wyoming. Photographs taken by NPPA

members are reproduced in various media outlets, both in print and on the Internet. While NPPA members do not necessarily take photographs with the express purpose of submitting the photographs to government agencies, government agencies and personnel routinely receive and consider information contained in these photographs, as do voters, businesses, and other individuals and entities that may in turn submit these photographs to government agencies. The third-party submission of NPPA members' photographs to government agencies could cause these members to run afoul of Wyoming Statutes § 6-3-414 and § 40-26-101. The submission of photographs to government agencies is not unlawful under Wyoming trespass law, other than by operation of the Data Censorship Statutes. Although NPPA members desire to continue taking and disseminating photographs and video recordings considered to be "resource data" on open lands in Wyoming, the Statutes have curtailed these activities, causing NPPA members to question their ability to take assignments photographing open lands in Wyoming that could lead to criminal or civil liability under the Data Censorship Statutes.

24.    NPPA members have been, and continue to be, injured by the Data Censorship Statutes because those Statutes thwart the intention of NPPA members, and have blocked the past and future plans of NPPA members, to enter public land in Wyoming without obtaining prior written or verbal permission from the landowner, for the purpose of taking photographs that may be submitted to state and federal agencies.

14

But for the threat of criminal prosecution and civil liability under the Statutes, NPPA

members would follow through with their plans to collect such data. Only if these

Statutes are struck down will the injuries to NPPA members be redressed. Only if

enforcement of the Data Censorship Statutes is enjoined will the Statutes' injuries to

NPPA members be redressed.

### Natural Resources Defense Council

25.     Plaintiff Natural Resources Defense Council, Inc. (NRDC) is a not-for-

profit membership corporation founded in 1970 and organized under the laws of the

State of New York. NRDC has offices in Bozeman, MT; Chicago, IL; New York, NY; San

Francisco and Santa Monica, CA; Washington, DC; and Beijing, China. NRDC has about

300,000 members throughout the country, including hundreds of members in

Wyoming. NRDC's mission is to "safeguard the Earth: its people, its plants and

animals, and the natural systems on which all life depends."

26.     In carrying out its mission, NRDC gathers and preserves information

about the use and condition of natural resources, including the use and condition of

public and private lands in Wyoming. For example, NRDC: (a) seeks to protect

Wyoming wildlife, including the greater sage grouse, bison, wolves, and other species,

by encouraging better management of public land and stronger implementation of

federal and state laws; (b) evaluates and urges government agencies to more adequately

address adverse impacts of livestock grazing on public land; (c) works to understand

and limit damage to the environment and health from energy resource development, including coal mining, uranium mining, and oil and gas development in Wyoming; and (d) has investigated, and advocates for the mitigation of, the impacts of climate change on Wyoming species. NRDC uses information on land and land use to inform and persuade government agencies in its investigations and advocacy, as well as in communicating with the broader public. NRDC has in the past collected information from open lands in Wyoming that would constitute "resource data" within the meaning of the Data Censorship Statutes, and has reported to the government resource data in Wyoming collected by others. NRDC wishes to continue engaging in these activities. However, the Statutes deter NRDC from future collection and reporting of such data in Wyoming.

27.    For example, over the past decade or so, NRDC has engaged in substantial work to protect whitebark pine, a species endemic to Wyoming. NRDC petitioned the U.S. Fish and Wildlife Service to list whitebark pine under the Endangered Species Act, and jointly funded a study of whitebark pine that included ground surveys on open land in Wyoming. The Fish and Wildlife Service considered this study and determined that the listing of the whitebark pine was warranted. Until the passage of the Data Censorship Statutes, NRDC's webpage continued to ask citizen scientists to "tak[e] photographs of whitebark pine on the landscape, and record[] the location where the photograph was taken"; "[r]ecord[] written observations of the whitebark pine you

16

see"; and "[c]ount[] Clark's nutcrackers and red squirrels, and record[] any observations of bear signs in whitebark forests," to "extend our knowledge base and . . . help formulate recommendations for managers to focus their conservation and restoration efforts." NRDC removed this request for citizen scientists' help from its website only after Wyoming's enactment of the Data Censorship Statutes, and did so in direct response to those Statutes, which could make such citizen science illegal.

28.     After enactment of the Data Censorship Statutes, NRDC staff canceled a planned investigatory visit to open lands in Wyoming related to NRDC's participation in a contested proceeding before the U.S. Environmental Protection Agency. NRDC canceled the investigatory visit in part because visiting the site to collect resource data could have violated the Data Censorship Statutes.

29.     Before enactment of the Data Censorship Statutes, NRDC began a project to monitor air quality on open lands in Wyoming and Montana near oil and gas development sites. NRDC staff visited potential air quality monitoring locations in both states, and collected resource data to support future monitoring work at those locations. NRDC now wishes and intends to deploy air quality monitoring equipment in both Wyoming and Montana to collect data concerning air quality on open lands near oil and gas development sites. NRDC wishes and intends to undertake this air quality monitoring effort beginning in the fall of 2015. NRDC would make the data it collects public, and would submit the data to appropriate state and/or federal regulators, as

17

appropriate, to encourage stronger protections for public health and the environment. NRDC is presently pressing forward with this air quality monitoring work in Montana, where it has identified specific testing sites and is now developing sampling plans. However, the Data Censorship Statutes have deterred NRDC from pressing forward with similar data collection in Wyoming.

30.     NRDC has been, and continues to be, injured by the Data Censorship Statutes because the Statutes thwart NRDC's intent, and have forced NRDC to cancel plans, to collect resource data on public land in Wyoming, without obtaining prior written or verbal permission from the landowner, for the purpose of making that data public and submitting the data to state and federal agencies. But for the threat of criminal prosecution and civil liability under the Data Censorship Statutes, NRDC would have followed through on its ongoing efforts to collect such data in Wyoming. Only if these Statutes are struck down, and enforcement against NRDC, its staff, and its members is enjoined, will the Statutes' injurious effects on NRDC and NRDC's staff and members be redressed.

**People for the Ethical Treatment of Animals**

31.     Plaintiff People for the Ethical Treatment of Animals, Inc. (PETA) is a Virginia nonstock corporation and animal protection charity. PETA has members in Wyoming. PETA is dedicated to protecting animals from abuse, neglect, and cruelty, and undertakes these efforts through public education, undercover investigations,

18

research, animal rescue, legislation, special events, protest campaigns, and lawsuits to enforce laws enacted to protect animals. PETA, its staff, and its members have conducted dozens of investigations in the United States over the past three decades, exposing illegal animal abuse and turning the results of each investigation over to appropriate law enforcement and/or regulatory authorities. PETA's investigations involve entering agricultural facilities located outside of incorporated cities, towns, and subdivisions, to take audio and video recordings regarding agriculture and animal species. As recently as last year, a PETA investigator entered private, unincorporated land in Campbell, Carbon, Crook, Fremont, Johnson, Sweetwater, and Weston Counties in Wyoming to take recordings exposing workers cruelly kicking and stomping sheep and standing on sheep's heads and necks. PETA gathered this "resource data" with the intent to submit it to an agency of the state government within the meaning of Wyoming Statute § 6-3-414(d)(i), and did in fact submit the information to the Wyoming Livestock Board.

32.     PETA continues to conduct these investigations to expose further illegal conduct in states other than Wyoming. Although PETA wishes to undertake additional investigations in Wyoming as well, the threat of criminal prosecution under Wyoming Statute § 6-3-414 and civil liability under Wyoming Statute § 40-26-101 has stymied PETA's plans to do so. PETA uses investigations to support its litigation and outreach, and these Statutes directly impede PETA's efforts by reducing or eliminating the ability

19

of PETA and its members to conduct such investigations. The Statutes impair PETA's

ability to carry out its core mission, and have forced PETA to divert resources to

educate the public regarding the Statutes and to oppose the Statutes. The resources

spent opposing these Statutes have diminished PETA's resources for its more

traditional, core educational goals. The Statutes' injuries to PETA will be redressed only

if the Statutes are struck down and if their enforcement against PETA, its staff, and its

members is enjoined.

**Center for Food Safety**

33.     Plaintiff Center for Food Safety (CFS) is a national non-profit organization

with over 950 members in Wyoming. CFS is dedicated to empowering people,

supporting farmers, and protecting the earth from the harmful impacts of industrial

agriculture. To promote transparency and accountability in industrial agriculture, CFS

uses regulatory actions, citizen engagement, legislation, and, when necessary, litigation.

CFS has worked to reduce water and air pollution from animal factories in Wyoming,

including in Park, Goshen, Laramie, Platte, and Albany Counties. In addition, CFS

members investigate the environmental impacts of industrial agricultural facilities on

public land. CFS uses videos, imagery, information, and records obtained during

undercover investigations for its legal, policy, advocacy, educational, and outreach

work. To further that work, CFS disseminates an array of resource data and

informational materials addressing the harmful effects of industrial agriculture to government agencies, members of Congress, and the general public.

34.     Another cornerstone of CFS's mission is to inform, educate, and counsel CFS members and the public on the harms caused by cultivation of genetically engineered (GE) crops that are designed to withstand application of toxic herbicides. CFS acts as a watchdog by ensuring that federal agencies with regulatory authority over food production comply with their statutory mandates and other federal environmental statutes, such as the National Environmental Policy Act and the Endangered Species Act, when overseeing field trials of GE crops, including those in Wyoming. In doing so, CFS has investigated contamination of alfalfa seeds and sugar beet crops with GE varieties in Wyoming. Through legal, scientific, and grassroots action, CFS protects the public's right to know how its food is produced.

35.     CFS relies on land use information gathered on open land, in rural Wyoming and beyond, to advocate against industrial agricultural practices that degrade the environment. CFS's activities to investigate and communicate to the public and government agencies the environmental impacts associated with agricultural practices in Wyoming have been, and continue to be, impaired by the Statutes, which purport to prohibit the collection and publication of such "resource data." Because the Statutes are frustrating CFS's activities in Wyoming described above, CFS has diverted resources from other programs to educate its members about Wyoming Statutes § 6-3-414 and

§ 40-26-101 and to oppose those Statutes. The resources spent opposing these Statutes have diminished CFS's resources for undertaking the core activities that further its mission. The Statutes' injuries to CFS will be redressed only if the Statutes are struck down and their enforcement is enjoined.

### Defendants

36.     Defendant Peter K. Michael is Attorney General of Wyoming, and is sued in that official capacity. The Attorney General of Wyoming oversees the enforcement of Wyoming's criminal laws, represents Wyoming counties in criminal prosecutions upon the failure of any district or county attorney to do so, and has the duty to represent the State in criminal cases before the Wyoming Supreme Court.

37.     Defendant Todd Parfitt is Director of the Wyoming Department of Environmental Quality, and is sued in his official capacity. The Data Censorship Statutes purport to impose on Director Parfitt a duty to "not consider[]" data collected and reported in violation of these statutes, and to "expunge[]" such data from the files and databases of the Wyoming Department of Environmental Quality. Wyo. Stat. § 6-3-414(e), (f); *id.* § 40-26-101(d)-(f).

38.     Defendant Patrick J. Lebrun is County Attorney of Fremont County, Wyoming, and is sued in his official capacity. As County Attorney, Mr. Lebrun is authorized to prosecute alleged violations of Wyoming Statute § 6-3-414 in Fremont County. *See* Wyo. Stat. § 18-3-302.

39.     Defendant Joshua Smith is County Attorney of Lincoln County, Wyoming,

and is sued in his official capacity. As County Attorney, Mr. Smith is authorized to

prosecute alleged violations of Wyoming Statute § 6-3-414 in Lincoln County. *See* Wyo.

Stat. § 18-3-302.

40.     Defendant Clay Kainer is County and Prosecuting Attorney of Sublette

County, Wyoming, and is sued in his official capacity. As County and Prosecuting

Attorney, Mr. Kainer is authorized to prosecute alleged violations of Wyoming Statute

§ 6-3-414 in Sublette County. *See* Wyo. Stat. § 18-3-302.

41.     Defendant Matt Mead is Governor of Wyoming, and is sued in his official

capacity. As Governor of Wyoming, he has statutory authority to "supervise collection

of all data on public lands which may impact agricultural, mineral, geological, historical

or environmental resources," Wyo. Stat. § 9-1-224(a); a duty to "provide for a repository

for all data collected under" that authority, *id.* § 9-1-224(e); and a duty to "promulgate

rules and regulations necessary to implement" that authority, "including establishing

standards for data collection consistent with other standard peer reviewed scientific

research," *id.* § 9-1-224(g).

## The Criminal Data Censorship Statute

42.     Wyoming Statute § 6-3-414 is entitled "Trespassing to unlawfully collect

resource data; unlawful collection of resource data." This Statute criminalizes

unauthorized entry onto open land—even public land, and even if unintentional—by a

23

person who collects or intends to collect information about the land or land use, if that

information is submitted, or intended to be submitted, to any agency of the state or

federal government. The Statute also criminalizes authorized entry onto open lands by

a person who collects or intends to collect information about the land or land use, if that

person lacks specific authorization to collect such information, and if that information is

submitted, or intended to be submitted, to any government agency.

43.     The new criminal statute's first subsection, Wyoming Statute § 6-3-414(a),

creates the crime of "trespassing to unlawfully collect resource data," which it defines

as follows:

> A person is guilty of trespassing to unlawfully collect resource data
> if he:
>
> (i) Enters onto open land for the purpose of collecting resource
> data; and
>
> (ii) Does not have:
>
> (A) An ownership interest in the real property or, statutory,
> contractual or other legal authorization to enter or access the
> land to collect resource data; or
>
> (B) Written or verbal permission of the owner, lessee or
> agent of the owner to enter or access the land to collect the
> specified resource data.

44.     The new criminal statute's second subsection, Wyoming Statute § 6-3-

414(b), creates the crime of "unlawfully collecting resource data," which it defines as

follows:

A person is guilty of unlawfully collecting resource data if he enters onto private open land and collects resource data without:

> (i) An ownership interest in the real property or, statutory, contractual or other legal authorization to enter the private land to collect the specified resource data; or

> (ii) Written or verbal permission of the owner, lessee or agent of the owner to enter the land to collect the specified resource data.

45.     Wyoming Statute § 6-3-414(c) provides that, on a first conviction, a person convicted of either of the new crimes of "trespassing to unlawfully collect resource data" or "unlawfully collecting resource data" is subject to imprisonment for up to one year, a fine of up to $1000, or both. On a second conviction of either crime, a person is subject to imprisonment of not less than ten days and up to one year, and a fine of up to $5000, or both. By contrast, the general crime of trespass under Wyoming law is punishable only by imprisonment of up to six months, a fine of not more than $750, or both. *See* Wyo. Stat. § 6-3-303(b).

46.     Wyoming Statute § 6-3-414(d)(i) defines "[c]ollect" to mean "take a sample of material, acquire, gather, photograph, or otherwise preserve information in any form from open land which is submitted or intended to be submitted to any agency of the state or federal government." The definition does not require that the "submi[ssion]" be by the person who gathered the data in question. Thus the unilateral act of an unrelated third party, in submitting, for example, photographs or video recordings, to a government agency, could convert otherwise legal activity into criminal activity.

47.     Wyoming Statute § 6-3-414 does not define "agency."

48.     Subject to three specified exceptions, Wyoming Statute § 6-3-414(d)(iv)

defines "[r]esource data" to include all "data relating to land or land use." That data

includes, but is not limited to, data concerning agriculture, minerals, geology, history,

cultural artifacts, archaeology, air, water, soil, conservation, habitat, vegetation, or

animal species. *Id*.

49.     As noted in the preceding paragraph, three kinds of data are excluded

from Wyoming Statute § 6-3-414's definition of "[r]esource data." The exclusions

encompass: (a) data "[f]or surveying to determine property boundaries of the location

of survey monuments"; (b) data "[u]sed by a state or local governmental entity to assess

property values"; and (c) data "[c]ollected or intended to be collected by a peace officer

while engaged in the lawful performance of his official duties." Wyo. Stat. § 6-3-

414(d)(iv). Data concerning land or land use that is reported by a private person *to* a

peace officer or another official is not excluded from the definition of "resource data"

under Wyoming Statute § 6-3-414(d)(iv). Data concerning land or land use that is

collected by a government official who is not a "peace officer" is likewise not

specifically excluded from the definition of "resource data," unless it falls within one of

the other two exemptions. Wyo. Stat. § 6-3-414(d)(iv).

50.     Wyoming Statute § 6-3-414(d)(ii) defines "[o]pen land" to mean "land

outside the exterior boundaries of any incorporated city, town, subdivision, approved

pursuant to W.S. 18-5-308 or development approved pursuant to W.S. 18-5-403." This

definition is so broad that it encompasses most of Wyoming, and includes land owned

by the federal government, the state government, and private citizens. It does not

exclude even rights of way, public easements, or public roads.

51.     Wyoming Statute § 6-3-414(e) provides: "No resource data collected in

violation of this section is admissible in evidence in any civil, criminal or administrative

proceeding, other than a prosecution for violation of this section, or a civil action

against the violator." This provision purports to generally prohibit government

agencies from considering data that could allow those agencies to make better

informed, more accurate, and more scientifically sound decisions—even if, but for the

Data Censorship Statutes, use of that data would be lawful. This provision does not

exempt federal government agencies from its ambit.

52.     Wyoming Statute § 6-3-414(f) provides that "[r]esource data unlawfully

collected under this section in the possession of any governmental entity as defined by

W.S. 1-39-103(a)(i) shall be expunged by the entity from all files and data bases, and it

shall not be considered in determining any agency action." The term "governmental

entity" is defined in Wyoming Statute § 1-39-103(a)(i) to include the State of Wyoming,

the University of Wyoming, and any local government. Wyoming Statute § 6-3-414(f) is

crafted so as to prevent the specified government entities from considering data that

could allow those agencies to make better informed, more accurate, and more

27

scientifically sound decisions—even if, but for the Data Censorship Statutes, use of that data would be lawful.

## The Civil Data Censorship Statute

53.     The Wyoming Legislature also adopted a civil statute entitled "Trespass to unlawfully collect resource data; unlawful collection of resource data." This civil Data Censorship Statute is codified at Wyoming Statute § 40-26-101. It too prohibits unintentional trespass, albeit only if the person enters land with the intent to acquire information about the land or its use, if that information is submitted or intended to be submitted to the government, and if the person lacks specific authorization to acquire such information from the landowner, lessee, or agent of the landowner, or other legal authorization. This prohibition applies even if the lands in question are public land. The Statute also prohibits authorized entry by a person who intends to collect information about the land or land use, if that person lacks specific authorization to collect such information, and if that information is submitted, or intended to be submitted, to the government.

54.     The new civil statute's first subsection, Wyoming Statute § 40-26-101(a), creates a new unlawful act, "civil trespass to unlawfully collect resource data," defined as follows:

> A person commits a civil trespass to unlawfully collect resource data if he:

28

(i) Enters onto open land for the purpose of collecting resource data; and

(ii) Does not have:

(A) An ownership interest in the real property or, statutory, contractual or other legal authorization to enter or access the land to collect resource data; or

(B) Written or verbal permission of the owner, lessee or agent of the owner to enter or access the land to collect the specified resource data.

55.     The statute's second subsection, Wyoming Statute § 40-26-101(b), creates a second new unlawful act, "civil trespass of unlawfully collecting resource data," defined as follows:

A person commits a civil trespass of unlawfully collecting resource data if he enters onto private open land and collects resource data without:

(i) An ownership interest in the real property or, statutory, contractual or other legal authorization to enter the private land to collect the specified resource data; or

(ii) Written or verbal permission of the owner, lessee or agent of the owner to enter the land to collect the specified resource data.

56.     Wyoming Statute § 40-26-101(c) provides that a person who "trespasses to unlawfully collect resource data" or a person who "unlawfully collects resource data" is liable to the owner or lessee of the land for all consequential and economic damages proximately caused by the trespass. In addition, a successful claimant under Wyoming

Statute § 40-26-101(c) "shall be awarded litigation costs," including reasonable attorney fees.

57.     Wyoming Statute § 40-26-101(d), as codified, provides that "[r]esource data unlawfully collected under this section is not admissible in evidence in any civil, criminal, or administrative proceeding, other than a civil action for trespassing under this section or a criminal prosecution for trespassing under W.S. 6-3-414." This provision purports to generally prohibit government agencies from considering data that could allow those agencies to make better informed, more accurate, and more scientifically sound decisions—even if, but for the Data Censorship Statutes, use of that data would be lawful. This provision does not exempt federal government agencies from its ambit.

58.     Wyoming Statute § 40-26-101(e) provides that "[r]esource data unlawfully collected under this section is not admissible in evidence in any civil, criminal or administrative proceeding, other than a civil action for trespassing under this section or a criminal prosecution for trespass." This provision essentially repeats Wyoming Statute § 40-26-101(d), but uses slightly different wording. Like Wyoming Statute § 40-26-101(d), section 40-26-101(e) purports to generally prohibit government agencies from considering data that could allow those agencies to make better informed, more accurate, and more scientifically sound decisions—even if, but for the Data Censorship

Statutes, use of that data would be lawful. This provision does not exempt federal government agencies from its ambit.

59.     Wyoming Statute § 40-26-101(f) provides that "[r]esource data unlawfully collected under this section in the possession of any governmental entity as defined by W.S. 1-39-103(a)(i) shall be expunged by the entity from all files and data bases, and it shall not be considered in determining any agency action." The term "governmental entity" is defined in Wyoming Statute § 1-39-103(a)(i) to include the State of Wyoming, the University of Wyoming, and any local government. Wyoming Statute § 40-26-101(f) is crafted so as to prevent the specified government entities from considering data that could allow those agencies to make better informed, more accurate, and more scientifically sound decisions—even if, but for the Data Censorship Statutes, use of that data would be lawful.

60.     Wyoming Statute § 40-26-101, as codified, does not contain any definitions.

## The Role of Citizen Science and Public Reporting in Governmental Decision-making

61.     The right of citizens to communicate with government officials is so fundamental to our democracy that it is specifically protected by the First Amendment's Petition Clause, which allows "no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances." U.S. Const., amend. I; *see also Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015) (noting that the First Amendment applies

to the states through the Fourteenth Amendment). Americans' ability to communicate information to federal and state agencies allows citizens to inform and influence government decisions, to protect their interests, and to participate in our republican form of government.

62.     The importance that Congress places on public input is reflected in the numerous provisions of federal law that require agencies to solicit and consider such input. For example, the Administrative Procedure Act generally requires that, when a federal agency engages in informal rulemaking, which is the means through which federal environmental agencies usually promulgate regulations, it must provide notice to the public and an opportunity to comment. *See* 5 U.S.C. § 553(c); *see also id.* § 554(c) (requiring agencies conducting adjudications to give all interested parties opportunities for "the submission and consideration of facts"). This statutory right entitles the public to review and respond to the most critical factual material used by the agency, to "give affected parties an opportunity to participate in agency decisionmaking early in the process," *N. Arapahoe Tribe v. Hodel,* 808 F.2d 741, 751 (10th Cir. 1987). Federal agencies must take the public's data into account, "consider[ing] and respond[ing] to significant comments received during the period for public comment." *See Perez v. Mortgage Bankers Ass'n,* 135 S. Ct. 1199, 1203 (2015).

63.     Consistent with these principles:

a.      The Clean Water Act's first section states that "Public participation in the development, revision, and enforcement of any regulation, standard, effluent limitation, plan, or program established by the Administrator or any State under this chapter shall be provided for, encouraged, and assisted by the Administrator and the States." 33 U.S.C. § 1251(e).

b.      Federal regulations that implement the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4370h, require that, when a federal agency considers the impacts of a major federal project affecting the environment, the agency must "[s]olicit appropriate information from the public." 40 C.F.R. § 1506.6(d). These public comment procedures are designed to protect against "uninformed . . . agency action." *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 704 (10th Cir. 2009) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989)).

c.      The Endangered Species Act permits citizens to petition the Secretary of the Interior and the Secretary of Commerce to list species as endangered, and the Secretary must review the species' status if the petition presents substantial scientific information that the listing is warranted. 16 U.S.C. § 1533(b)(3)(A).

d.      The Federal Land Policy and Management Act, 43 U.S.C. §§ 1701-1787, establishes the policy of the United States to manage public land "in a

manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air, and atmospheric, water resource, and archeological values," *id.* § 1701(a)(8), and to ensure that federal agencies "consider[] the views of the general public" and provide for "third party participation" when land use decisions are made, *id.* § 1701(a)(5). Consistent with these goals, Congress required the federal agencies that implement the Federal Land Policy and Management Act to provide opportunities for and to consider public input when developing, formulating, and revising land use plans. *Id.* §§ 1712(f), 1739; *see also id.* § 1740 (requiring that rulemaking concerning public land be conducted pursuant to the public notice-and-comment provisions of 5 U.S.C. § 553).

e.     The National Forest Management Act, 16 U.S.C. §§ 1600-1687, requires the creation of comprehensive forest plans for each of the more than 100 national forests and grasslands. Consistent with this goal, Congress requires federal agencies that implement the National Forest Management Act to provide opportunities for and to consider public input when developing, formulating, and revising land use plans. *See* 16 U.S.C. § 1604(d); *see also, e.g.,* 36 C.F.R. § 218.24-.25.

f.     Regulations implementing the Federal Food, Drug, and Cosmetics Act, 21 U.S.C. §§ 301-399, authorize an "interested person" to "petition the Commissioner [of the federal Food and Drug Administration] to issue, amend, or

revoke a regulation or order, or to take or refrain from taking any other form of administrative action." 21 C.F.R. § 10.25(a). Citizen petitions are required to include a "full statement" of the "factual . . . grounds" for the petition, "including all relevant information . . . on which the petitioner relies." 21 C.F.R. § 10.30(a)(3).

### The Data Censorship Statutes Chill Otherwise Lawful Citizen Science and Constitutionally Protected Expression and Petitioning

64.     Plaintiffs Western Watersheds, NRDC, PETA, and CFS, and/or their members, collect resource data from open lands in Wyoming, and report data they collect to agencies of the federal or state government. The organizations engage in this work as part of their advocacy and to promote better-informed government decisions regarding environmental and animal protection. Plaintiff NPPA's members collect resource data from open lands in Wyoming, and report data they collect in various publications, broadcasts, and online media, which are often shared by third parties with agencies of the federal or state government. Plaintiffs and their members would like to continue to collect such data—through, for example, photography, videography, sampling, and audio recording—but fear prosecution under Wyoming Statute § 6-3-414, and litigation and civil liability under § 40-26-101.

65.     The kinds of resource data that Plaintiffs or their members have collected in the past include, for instance, water quality data, information on the distribution of protected or potentially protected species, information documenting cruelty to animals, and information documenting the effects of climate change on species. Federal and state

35

agencies have in the past often relied on data of this sort that has been collected by Plaintiffs, their members, and other citizen scientists. For example:

      a.      Western Watersheds has collected water quality samples from numerous waterways on open lands in Wyoming, to assess the impacts of livestock grazing on water quality. Plaintiff typically tests those samples for *E. coli*, fecal coliform, sediment levels, temperature, pH, dissolved oxygen, turbidity, and total dissolved solids. Western Watersheds has submitted this data to the Wyoming Department of Environmental Quality, the agency authorized to oversee implementation of the Clean Water Act's non-point-source pollution regulations in Wyoming. This has led DEQ to list various streams as impaired under § 303(d) of the Clean Water Act, including Clarks Draw, Pacific Creek, and Lander Creek. Based on Western Watershed's data submissions, five other creeks were included in a draft list for 2014.

      b.      Western Watersheds has also collected data from open lands in Wyoming to measure the impact of livestock grazing on riparian zones, which are ecologically significant areas at the interface of land and rivers or streams. Western Watersheds has used Multiple Indicator Monitoring (MIM), an agency approved method of measuring riparian health parameters, to collect data concerning grazing impacts on stream width/depth ratios, riparian vegetation, woody plant utilization, and stream bank stability. Western Watersheds has

measured MIM parameters alongside Bureau of Land Management and U.S.

Forest Service staff to ensure they are performing fair assessments. It has also

collected and submitted MIM data to the Bureau of Land Management and

Forest Service to persuade them to improve livestock management on public

land as mandated by the Federal Land Policy and Management Act, the National

Forest Management Act, and the National Environmental Policy Act.

      c.     Western Watersheds has also collected data from open lands in

Wyoming to measure livestock grazing impacts on upland conditions. For

example, Western Watersheds has measured vegetation composition

(biodiversity) and utilization (forage removal by livestock measured as a

percentage). Western Watersheds has measured these parameters alongside

Bureau of Land Management and U.S. Forest Service staff to ensure they are

performing fair assessments. Western Watersheds has also collected and

submitted these data to the Bureau of Land Management and the U.S. Forest

Service, to persuade them to improve the management of livestock on public

land as mandated by the Federal Land Policy and Management Act, the National

Forest Management Act, and the National Environmental Policy Act.

      d.     Western Watersheds has also undertaken riparian-sediment core

sampling on Wyoming open lands, to measure the impact of livestock grazing on

sediment levels in native-trout-spawning streams. Livestock increase sediment

levels, and sediment decreases spawning success. Western Watersheds has submitted such data to the Bureau of Land Management and the U.S. Forest Service, to help them improve fisheries management as mandated by the Federal Land Policy and Management Act, the National Forest Management Act, and the National Environmental Policy Act.

      e.     Western Watersheds has also engaged in various types of photo documentation of Wyoming open lands, including documentation of erosion processes, livestock counts, grazing permit compliance, and "trespass" livestock (cattle or sheep that graze in an allotment where they are not authorized to graze). Western Watersheds has undertaken this documentation alongside Bureau of Land Management and U.S. Forest Service staff, to ensure they are performing fair assessments. Plaintiff has also collected these data and submitted them to the Bureau of Land Management and the U.S. Forest Service, to persuade those agencies to improve livestock management on public land as mandated by the Federal Land Policy and Management Act, the National Forest Management Act, and the National Environmental Policy Act.

      f.     Western Watersheds has also collected resource data to assess sage grouse habitat on Wyoming open lands, and submitted such data to the Bureau of Land Management to help the agency improve its management of sage grouse habitat under the Endangered Species Act.

38

g.      NPPA's members have photographed and recorded grizzly bear

traps, wildfires, bat habitats, ranching, mineral rights issues, natural gas drilling,

weather emergencies, and environmental studies in places such as Pinedale, the

Medicine Bow River, the Snake River, and the Sheridan and Tongue River area.

Photographs and video recordings taken by NPPA's members have been part of

the public conversation about development, land rights, and environmental

issues.

h.      NRDC has collected data concerning whitebark pine (*Pineus*

*albicaulis*) on open lands in Wyoming, including by partially funding a scientific

study that included ground-level surveys of whitebark pine habitat. NRDC

provided data concerning whitebark pine, including the study it funded, to the

U.S. Fish and Wildlife Service in support of listing whitebark pine as threatened

or endangered under the Endangered Species Act, 16 U.S.C. § 1533. In response

to NRDC's listing petition, the Fish and Wildlife Service determined that listing

whitebark pine for range-wide protection under the Endangered Species Act was

warranted, although due to resource constraints the Service has not yet listed this

species. *See* Dep't of the Interior, Fish & Wildlife Serv., *Endangered and Threatened*

*Wildlife and Plants: 12-Month Finding on a Petition to List Pinus ablicaulis as*

*Endangered or Threatened with Critical Habitat*, 76 Fed. Reg. 42,631, 42,632, 42,647-

50 (July 19, 2011). NRDC has also provided water quality data to state and

federal agencies in support of their identification of waters as "impaired" under the Clean Water Act, and state and federal agencies have relied on that data in making impairment determinations.

        i.     PETA has taken audio and video recordings, at ranches on unincorporated land in Wyoming, of individuals violating Wyoming's cruelty-to-animals statute, Wyo. Stat. § 6-3-203, by kicking sheep; stomping on sheep's heads and necks; throwing sheep on the floor; denying appropriate care to a seriously ill or injured ram, resulting in the ram's death; and failing to provide appropriate care for injured sheep. PETA has provided these recordings to a Wyoming state agency.

        j.     CFS members monitor, document, and report information pertaining to hazardous releases from industrial agricultural facilities, often collecting this information on public land. CFS members presented testimony of these findings to state agencies and legislatures to advocate for more oversight of the industrial agriculture industry.

66.    Much of Wyoming is comprised of open land to which the Data Censorship Statutes apply. It is often difficult to determine who owns, or is a lessee or agent of an owner of, particular open land.

67.    Plaintiffs' members and staff are uncertain what conduct may subject them to criminal prosecution under Wyoming Statute § 6-3-414 and to civil liability

under Wyoming Statute § 40-26-101. For example, while the crime of "trespassing to

unlawfully collect resource data" does not apply to a person who has "legal

authorization to enter or access the land to collect resource data," Wyo. Stat. § 6-3-

414(a), the Statute does not define that phrase, *see id.* § 6-3-414(d). Similarly, while the

crime of "unlawfully collecting resource data" does not apply to a person who has

"legal authorization to enter the private land to collect the specified resource data," *id.*

§ 6-3-414(b), the Statute does not define that phrase, either, *see id.* § 6-3-414(d).

68.    The Rules and Regulations of Wyoming's Board of Land Commissioners

"extend[] to the public the privilege of using legally accessible state lands for casual

recreational day uses, unless otherwise closed by direction of the Board." Office of Land

and Land Invs., Bd. of Land Comm'rs R. and Regs., Ch. 13, § 4. Under that Board's

Rules and Regulations, the phrase "casual recreational uses" "means uses such as

horseback riding, photography, wildlife and bird observation, hiking, rock hunting, and

other recreational day use." *Id.* § 2(b). However, "[o]rganized, developed, or

commercial recreational use of state lands is prohibited unless it occurs under the

provisions of a special use lease." *Id.* § 4. Plaintiffs are uncertain whether the Board's

Rules and Regulations constitute "legal authorization to enter or access the land to

collect resource data." Wyo. Stat. §§ 6-3-414(a)(ii)(A), 40-26-101(a)(ii)(A). In light of this

uncertainty, members of the public must avoid conduct that could be lawful under the

Data Censorship Statutes, for fear of risking criminal prosecution or civil liability under those Statutes.

69.     More than eighteen million acres of Wyoming land—almost thirty percent of the state's total land area—are under the management of the federal Bureau of Land Management (BLM). *See* BLM's *Public Land Statistics—2014*, tbl. 1-3, http://www.blm.gov/public_land_statistics/pls14/pls2014.pdf. BLM has promulgated regulations that generally permit "any short term non-commercial activity which does not cause appreciable damage or disturbance to the public lands, their resources or improvements, and which is not prohibited by closure of the lands to such activities." 43 C.F.R. §§ 2920.0-5(k), 2920.1-2(a). It is unclear whether these Bureau regulations constitute "legal authorization to enter or access the land to collect resource data." Wyo. Stat. §§ 6-3-414(a)(ii)(A), 40-26-101(a)(ii)(A). This uncertainty compels members of the public to avoid conduct that could be lawful under the Data Censorship Statutes, for fear of risking criminal prosecution or civil liability under those Statutes.

70.     Under the Data Censorship Statutes, Plaintiffs, their staff, and their members risk criminal prosecution and civil liability if, while collecting resource data from open land, they step unintentionally onto land for which they lack specific authorization to collect resource data. The threat of prosecution and liability deters Plaintiffs, their staff, and their members from engaging in such activity. For example:

a.      Prior to enactment of the Data Censorship Statutes, a Western Watershed staff member usually spent three to five days per week, from mid-June through mid-October, collecting data on Bureau of Land Management and U.S. Forest Service lands in Wyoming. This data collection was undertaken for about twelve years before enactment of the Data Censorship Statutes. Normally, this staff member would collect data that measured the impacts of livestock grazing on riparian wildlife habitat, uplands, water quality, and other environmental characteristics, while also alerting the Bureau of Land Management and U.S. Forest Service to instances of noncompliance with grazing permits. This year, the staff member has been unable to collect any such data due to fear of prosecution under the Data Censorship Statutes.

b.      Western Watersheds has routinely monitored the water quality of waterways on state and federal land. However, Western Watersheds has now suspended such activities at dozens of sampling locations in Wyoming because it is unsure whether collecting water samples from lands owned by the Bureau of Land Management would violate the Data Censorship Statutes. That the boundary between public and private lands is often unmarked has also influenced Western Watersheds' decision to suspend such activities. Likewise, because many roads built and maintained by the federal government may cross small sections of private land without any visual marking, Western Watersheds

43

is reasonably concerned that its members or staff could inadvertently enter private land while trying to monitor conditions on public land, or that they could be found not to have permission to collect resource data on public land.

      c.     Members of NPPA regularly photograph and record on "open land," whether documenting weather emergencies, environmental issues, or wildlife. NPPA is reasonably concerned that its members could inadvertently run afoul of the Statutes while reporting on matters of public concern. In June 2015, a member of NPPA received an offer for an assignment to do environmental photography on Bureau of Land Management and public-access land, and had significant uncertainty about whether doing so would run afoul of the Statutes.

      d.     In May 2015, an employee of NRDC wished to visit open land in Wyoming to observe, and potentially photograph, a restoration project. The employee was engaged in information collection related to a contested proceeding before the U.S. Environmental Protection Agency involving oil and gas development. He had received permission to visit the land from an entity that asserted an ownership interest in the land at issue, but was told by another entity that also asserted an ownership interest that he did not have permission to visit the site. Uncertain of the ownership of the land, and concerned about prosecution or liability, he did not visit the site or take photographs of it.

e.      In April 2015, PETA staff were contacted by a whistleblower who

alleged that a ranch located on unincorporated land allowed excess

accumulations of manure in the cattle pens, in some places three to four feet

deep; had several cows with udders so swollen that they were nearly dragging

on the ground; and had failed to remove dead cows from the feeding bunks.

PETA employees wished to work with the whistleblower to obtain photographic

or video evidence of conditions on the ranch. However, after taking into account

the Data Censorship Statutes, PETA did not seek to obtain such evidence.

**The Data Censorship Statutes Punish Citizens for Petitioning the Government**

71.     Under the Petition Clause of the First Amendment to the U.S.

Constitution, the government "shall make no law . . . abridging . . . the right of the

people . . . to petition the Government for a redress of grievances." U.S. Const.,

amend. I. The Petition Clause applies to the states, including Wyoming, under the

Fourteenth Amendment to the U.S. Constitution. U.S. Const., amend. XIV.

72.     The Data Censorship Statutes make conduct unlawful *because* a member of

the public communicates resource data to a government agency, or intends to do so.

Specifically, the Data Censorship Statutes apply only to persons who enter open land

for the purpose of "collecting" resource data or who enter private open land and

"collect" resource data. Wyo. Stat. § 6-3-414(a), (b); Wyo. Stat. § 40-26-101(a), (b).

"Collect" in this context means "to take a sample of material, acquire, gather,

45

photograph or otherwise preserve information in any form from open land *which is submitted or intended to be submitted to any agency of the state or federal government.*" Wyo. Stat. § 6-3-414(d)(i) (emphasis added). Thus, under the Statutes, a person may not be punished for trespassing to unlawfully collect resource data, or for unlawfully collecting resource data, unless the data is submitted, or intended to be submitted, to a state or federal agency. Communication with the government is an element of the offense.

73.     Members of the public, including Plaintiffs, communicate resource data to the general public and to the government to inform and influence agency decisions, and to seek "a redress of grievances." U.S. Const., amend. I. For example, Plaintiffs, their staff, and/or their members submit resource data to the government to seek redress of unlawful pollution of the Nation's waters.

74.     The Data Censorship Statutes are not narrowly tailored to a legitimate state interest, let alone to a compelling or overriding state interest. Prohibiting citizen communications with the government is not a purpose that the Constitution recognizes as legitimate. To the contrary, the First Amendment specifically protects such activity.

75.     Because the Data Censorship Statutes directly interfere with citizens' ability "to express their ideas . . . and concerns to their government," *Borough of Duryea v. Guarnieri*, 131 S. Ct. 2488, 2495 (2011), those Statutes violate the Petition Clause of the First Amendment.

### The Data Censorship Statutes Impose Liability
### Based on the Content and Viewpoint of Speech

76.     The Data Censorship Statutes make criminals and scofflaws of those who

speak out about what they see and find on open land. Although labeled as anti-

"trespass" laws, the Data Censorship Statutes prohibit and punish conduct that would

not violate Wyoming's longstanding trespass statute, Wyo. Stat. § 6-3-303, and make

otherwise-lawful activity unlawful solely because it is associated with advocacy—

communication of resource data to government agencies—about the condition and use

of open lands. The Constitution does not permit such a prohibition.

77.     Statutes that burden expression in support of public advocacy are subject

to the Constitution's most "exacting scrutiny," and cannot survive judicial review

unless "narrowly tailored to serve an overriding state interest." *McIntyre v. Ohio*

*Elections Comm'n*, 514 U.S. 334, 347 (1995).

78.     Governments have "'no power to restrict expression because of its

message, its ideas, its subject matter, or its content.'" *Reed v. Town of Gilbert*, 135 S. Ct.

2218, 2226 (2015) (quoting *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972)). In

disregard of this fundamental constitutional principle, the Data Censorship Statutes

prohibit, punish, and deter speech of a particular kind, on a particular subject, with a

particular set of recipients—targeting members of the public who collect and submit or

intend to submit resource data to state or federal agencies.

79.    "[T]he government may not regulate [speech] based on hostility—or

favoritism—towards the underlying message expressed." *R.A.V. v. St. Paul,* 505 U.S.

377, 386 (1992). The Data Censorship Statutes violate this principle. They were enacted

in an attempt to prevent the collection and communication of certain data to state and

federal agencies, because the Wyoming Legislature did not want state and federal

agencies to use that data to implement and effectively enforce duly enacted

environmental protection statutes.

80.    In addition, because the Data Censorship Statutes allow the landowner,

lessee, or landowner's agent to authorize the data collection and thus exempt a person

from the Statutes' prohibitions, these laws effectively grant the landowner, lessee, or

landowner's agent the power to authorize or prohibit who communicates resource data

to government agencies. The Statutes thus allow a landowner to authorize such

communications of resource data by persons whose viewpoint the landowner supports,

and effectively to criminalize communications of resource data by persons whose

viewpoint a landowner does not support. As one Wyoming Senator explained,

"Collecting data to be able to hold back certain organizations—I would tell you that's

exactly what this bill's designed to do."

### The Extraordinary Breadth of the Data Censorship Statutes

81.    The Data Censorship Statutes are unconstitutional on their face and as

applied to Plaintiffs' collection of resource data on open lands. However, even if

Wyoming could single out and prohibit Plaintiffs' data-collection and -reporting activities, these Statutes reach far beyond those activities.

82.    Read literally, Wyoming Statute § 6-3-414 makes a criminal out of a child who walks onto her neighbor's ranch to take a photo of a hawk for use in a public school photo competition—unless the child first obtains her neighbor's express permission to do so. Jail time and civil liability could be imposed under the Statutes on a rural traveler who hears a cry for help, unwittingly enters private land when venturing off the road without express permission to make observations, discovers an escalating wildfire, drops a "pin" on her GPS unit to record the location of the fire, and then provides that information to the fire department. Wyoming Statute § 6-3-414 on its face appears even to criminalize the conduct of a hiker who unintentionally crosses onto open private land without authorization, observes an illegal drug operation, records her observations, and reports those facts to a park ranger or county sheriff.

83.    Those individuals' actions would not be unlawful under the Data Censorship Statutes simply because they entered open land without authorization. Instead, the school child, the hiker, and the driver would have violated Wyoming law only because they informed the government about what they saw after entering open land, and because they did so without first obtaining permission from the landowner to access the land to collect that information.

49

84.     Wyoming has no legitimate state interest in proscribing such expression,

or indeed any of the expression of Plaintiffs. The Data Censorship Statutes are facially,

and unconstitutionally, overbroad.

**The Wyoming Statutes Prohibit Agencies from Considering Accurate Data**

85.     The Data Censorship Statutes also prohibit government agencies from

using information gathered and communicated in violation of the Statutes' terms. The

Statutes prohibit state or federal agencies from considering data on, for example, water

quality violations, sage grouse habitat, animal cruelty, and illegal mining activity, if the

data was collected and then reported by a person who did not have authorization to

enter the land in question to collect the data.

86.     In addition, Wyoming, the University of Wyoming, and local

governments are required to expunge such data from their files or databases. Wyo. Stat.

§ 6-3-414(f) (incorporating definition of "government entity" from Wyo. Stat. § 1-39-

103(a)(i)).

87.     The effect of the Data Censorship Statutes is to force the government to act

based on ignorance, rather than information. As further explained below, to the extent

that the Statutes purport to dictate how federal agencies consider relevant data, they are

plainly beyond Wyoming's lawful authority. To the extent that the Statutes require state

agencies implementing federally delegated programs to make decisions based on

willfully incomplete data, when better data is available, these provisions contravene

and are preempted by the Clean Water Act and other federal laws that require state

agencies implementing delegated federal programs to consider all available data.

## FIRST CAUSE OF ACTION

### THE RIGHT TO PETITION

**[U.S. Const., amend. 1 (Petition Clause) & amend. 14 (Due Process Clause); 42 U.S.C. § 1983]**

**[brought against all defendants except Todd Parfitt, as Director of the Wyoming Department of Environmental Quality]**

88.     Plaintiffs re-allege and incorporate by reference all allegations set forth

above.

89.     The Petition Clause of the First Amendment of the U.S. Constitution

provides that "Congress shall make no law . . . abridging . . . the right of the people . . .

to petition the Government for a redress of grievances." U.S. Const., amend. I.

90.     The Petition Clause of the First Amendment is applicable to the States

through the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

U.S. Const., amend. XIV, § 1.

91.     Wyoming Statutes § 6-3-414 and § 40-26-101 prohibit the "collect[ion]" of

"resource data" in certain circumstances. "Collect" is defined in such a way that it

applies only to information that "is submitted" or "is intended to be submitted" to "any

agency of the state or federal government." Wyo. Stat. § 6-3-414(d)(i).

92.     The Data Censorship Statutes prohibit activity only if that activity involves actual or intended communication between a person and a state or federal government agency. Even the unilateral acts of a third party could result in the data being "submitted" to an agency and therefore falling under the Statutes' coverage.

93.     The Data Censorship Statutes were intended to prevent and have prevented communications to the government in support of governmental action to protect the environment. Such communications are protected by the Petition Clause.

94.     Wyoming Statute § 6-3-414 unconstitutionally criminalizes petitioning activity that is protected by the Petition Clause of the First Amendment to the U.S. Constitution. Wyoming Statute § 40-26-101 imposes civil liability for the same conduct criminalized under § 6-3-414. These laws prohibit, punish, and deter activity that is a necessary predicate to, and that constitutes, petitioning of the government.

95.     Wyoming Statutes § 6-3-414 and § 40-26-101 are not justified by a legitimate governmental interest, let alone a compelling or overriding government interest.

96.     Wyoming Statutes § 6-3-414 and § 40-26-101 are not narrowly tailored to achieve any such legitimate, compelling, or overriding governmental interest.

97.     Wyoming Statutes § 6-3-414 and § 40-26-101 violate the Petition Clause of the First Amendment.

98.     Plaintiffs' rights under the Petition Clause are secured by 42 U.S.C. § 1983.

Wyoming Statutes § 6-3-414 and § 40-26-101 violate 42 U.S.C. § 1983.

99.     Plaintiffs and their members will suffer irreparable harm unless

Defendants are enjoined from enforcing Wyoming Statutes § 6-3-414 and § 40-26-101.

Plaintiffs have no adequate remedy at law and are entitled to injunctive and declaratory

relief on this claim.

## SECOND CAUSE OF ACTION

### FREE SPEECH

**[U.S. Const., amend. 1 (Freedom of Speech and Freedom of Press Clauses) &
amend. 14 (Due Process Clause); 42 U.S.C. § 1983]**

**[against all defendants except Todd Parfitt, as Director of the Wyoming Department
of Environmental Quality]**

100.    Plaintiffs re-allege and incorporate by reference all allegations set forth

above.

101.    The Free Speech Clause of the First Amendment to the U.S. Constitution

provides: "Congress shall make no law . . . abridging the freedom of speech, or of the

press." U.S. Const., amend. I.

102.    The Free Speech Clause of the First Amendment is applicable to the States

through the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

U.S. Const., amend. XIV, § 1.

103.    Although the Free Speech Clause protects expression of many kinds, its strongest protections apply to core, political speech, including speech that concerns or solicits governmental action or relates to a matter of public concern. Wyoming Statutes § 6-3-414 and § 40-26-101 apply only where a person intends to communicate resource data or when that resource data is communicated to a state or federal government agency. Such speech is intended to inform and influence the decisions of the public and the government on matters of public concern.

104.    Wyoming has laws that prevent trespass. *See, e.g.,* Wyo. Stat. § 6-3-303; *see also Salisbury Livestock Co. v. Colo. Cent. Credit Union,* 793 P.2d 470, 473 & n.1 (Wyo. 1990) (discussing trespass under Wyoming's common law). Trespass alone is not an expressive act, and this suit does not challenge Wyoming's longstanding trespass laws. Unlike those laws, the Data Censorship Statutes single out for punishment persons who collect and communicate information about land and land use, and other issues which are matters of public concern.

105.    The Data Censorship Statutes are not narrowly tailored to any legitimate, compelling, or overriding state interest.

106.    Wyoming Statutes § 6-3-414 and § 40-26-101 are unconstitutionally overbroad. The Data Censorship Statutes' restrictions on speech are unconstitutional in all applications. However, even if there were some constitutional application of the

Statutes' restrictions on speech, the Statutes prohibit substantially more speech than the First Amendment permits.

107.   Wyoming Statutes § 6-3-414 and § 40-26-101 unconstitutionally discriminate against speech based on content. The Data Censorship Statutes' prohibitions apply only to a person who communicates or intends to communicate resource data, on matters of public concern.

108.   Wyoming Statutes § 6-3-414 and § 40-26-101 unconstitutionally discriminate against speech based on viewpoint. The Data Censorship Statutes' prohibitions apply only to a person who collects or intends to collect resource data from open land without authorization. Authorization may be given or denied by a landowner, lessee, or representative of the landowner. A person does not "collect" resource data, under these Statutes, unless the person submits or intends to submit the data to a government agency, or the data is otherwise submitted to a government agency. Those provisions give landowners control over who may communicate "resource data" to the public or to the government. Speakers whose viewpoint is not shared by the landowner are unlikely to be able to obtain the landowner's authorization to collect resource data which may later be submitted to the government, either intentionally or unintentionally. "The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction," for "[v]iewpoint discrimination is . . . an egregious

form of content discrimination." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

109.    Wyoming Statutes § 6-3-414 and § 40-26-101 violate the Free Speech Clause of the First Amendment.

110.    Plaintiffs' rights under the First Amendment are secured under 42 U.S.C. § 1983. Wyoming Statutes § 6-3-414 and § 40-26-101 violate 42 U.S.C. § 1983.

111.    Plaintiffs and their members will suffer irreparable harm unless Defendants are enjoined from enforcing Wyoming Statutes § 6-3-414 and § 40-26-101. Plaintiffs have no adequate remedy at law and are entitled to injunctive and declaratory relief on this claim.

## THIRD CAUSE OF ACTION

### THE DATA CENSORSHIP STATUTES ARE PREEMPTED BY FEDERAL LAW

**[U.S. Constitution, Article VI, cl. 2 (Supremacy Clause); Clean Water Act, 33 U.S.C. §§ 1313, 1370, and implementing regulations; Administrative Procedure Act, 5 U.S.C. § 553; National Environmental Policy Act, 42 U.S.C. § 4332, and implementing regulations, 40 C.F.R. § 1506.6; Endangered Species Act, 16 U.S.C. § 1533]**

112.    Plaintiffs re-allege and incorporate by reference all allegations set forth above.

113.    Article VI, clause 2 of the U.S. Constitution, known as the Supremacy Clause, provides in pertinent part: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land;

and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

114.    Under the Supremacy Clause, state law is preempted when it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Russo v. Ballard Med. Prods.*, 550 F.3d 1004, 1011 (10th Cir. 2008) (quoting *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 478-79 (1974)).

115.    Wyoming Statute § 6-3-414 and Wyoming Statute § 40-26-101 prohibit citizen collection and reporting of data to the public or the government, when the citizen enters open land with the purpose of collecting data, or in fact collects such data, without authorization.

116.    Wyoming Statute § 6-3-414(e) and Wyoming Statute § 40-26-101(e) purport to prohibit the admission in any administrative, civil, or criminal proceeding of certain data collected and provided to the government by members of the public without authorization. Wyoming Statute § 6-3-414(f) and Wyoming Statute § 40-26-101(f) require specified government entities to expunge data collected and provided to the government by persons who lacked authorization.

117.    The Data Censorship Statutes stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. Indeed, one of the reasons the Wyoming Legislature adopted these Statutes was to deprive federal and state agencies of data they require to fully implement federal law.

**Preemption Under the Clean Water Act**

118.    One of Congress's express purposes in enacting the Clean Water Act was

to "provide[] for, encourage[], and assist[]" "[p]ublic participation in the development,

revision, and enforcement of any regulation, standard, effluent limitation, plan, or

program established by the Administrator or any State under this chapter." 33 U.S.C.

§ 1251(e).

119.    Section 303(d) of the Clean Water Act requires a state, or in some

circumstances the U.S. Environmental Protection Agency (EPA), to establish allowable

pollution levels, or "total maximum daily loads" (TMDLs), for water-quality-impaired

streams and rivers. 33 U.S.C. § 1313(d)(1)(A), (C); *id.* § 1313(d)(2). A TMDL must be

designed to attain and maintain applicable water quality standards. 40 C.F.R.

§ 130.7(c)(1).

120.    Federal implementing regulations require that, when implementing

§ 303(d), "[e]ach State shall assemble and evaluate all existing and readily available

water quality-related data and information," including all existing and readily available

information about "[w]aters for which water quality problems have been reported by

. . . members of the public." 40 C.F.R. § 130.7(b)(5).

121.    The Clean Water Act's implementing regulations specifically require state

agencies charged with implementation, including the Wyoming Department of

Environmental Quality, to "actively solicit[]" research from the public concerning water

58

quality, when setting TMDLs. 40 C.F.R. § 130.7(b)(5)(iii). The statute also requires states,

when setting TMDLs, to "evaluate all existing and readily available water quality-

related data and information" for which "water quality problems have been reported by

. . . members of the public." 40 C.F.R. § 130.7(b)(5). Data submitted by members of the

public have often played an important role in identifying impaired waters and

establishing TMDLs under § 303(d) of the Clean Water Act.

122.    EPA-approved TMDLs and their supporting water quality standards

provide the floor of federal protection for impaired waters. Section 510 of the CWA

provides that a state "may not adopt or enforce any effluent limitation, or other

limitation, effluent standard, prohibition, pretreatment standard, or standard of

performance which is less stringent than the effluent limitation, or other limitation,

effluent standard, prohibition, pretreatment standard, or standard of performance

under this chapter." 33 U.S.C. § 1370. An "effluent limitation" as used in § 510 of the

Clean Water Act is "any restriction established by a State or the Administrator [of EPA]

on quantities, rates, and concentrations of chemical, physical, biological, and other

constituents which are discharged from point sources into navigable waters." *Id.*

§ 1362(11).

123.    The Clean Water Act generally prohibits the discharge of pollutants to

waters of the United States without a permit. 33 U.S.C. § 1311(a). Such permits are

issued under the Act's National Pollution Discharge Elimination System. 33 U.S.C.

§ 1342. When a state or the EPA issues a National Pollution Discharge Elimination System permit, the issuing agency is required by law to allow the public to submit data concerning the permit for the agency's consideration. 40 C.F.R. §§ 124.10–124.11.

124.    Wyoming Statute § 6-3-414(e) and (f) and Wyoming Statute § 40-26-101(e) and (f) conflict with, and substantially undermine the purposes of, § 303(d) and § 510 of the federal Clean Water Act, 33 U.S.C. § 1370, and Clean Water Act implementing regulations, 40 C.F.R. § 130.7(b)(5), § 134.11.

**Preemption Under Other Federal Law**

125.    Federal law recognizes the importance of and encourages citizen participation in federal agency environmental decision-making. The Data Censorship Statutes obstruct the ability of Americans to participate fully in such decision-making processes, by collecting, reporting on, and/or submitting resource data to federal agencies and state agencies implementing federal law. Because the Data Censorship Statutes stand as an obstacle to the accomplishment and execution of the full purposes and objectives of federal law, they are preempted.

126.    When federal agencies prepare environmental impact reports under the National Environmental Policy Act, 42 U.S.C. § 4332, they must solicit public comment concerning, among other things, potential environmental impacts. 40 C.F.R. § 1506.6. The Data Censorship Statutes interfere with the implementation of this law by imposing punishments on persons who collect and communicate certain resource data to federal

agencies. The Data Censorship Statutes also interfere with the implementation of this law by imposing punishments on persons who collect and communicate certain resource data to the public through their publications or other news media, if the public then forwards that data to federal agencies.

127.    The Endangered Species Act authorizes citizens to petition the Secretary of the Interior and the Secretary of Commerce to list species as endangered, and the Act further requires each Secretary to list species as endangered if a citizen petition presents substantial scientific information that the listing is warranted. 16 U.S.C. § 1533(b)(3)(A). The Data Censorship Statutes interfere with the implementation of this law by imposing punishments on persons who collect and communicate certain resource data to federal agencies. The Data Censorship Statutes also interfere with the implementation of this law by imposing punishments on persons who collect and communicate certain resource data to the public through their publications, broadcast, or other news media, if the public then forwards that data to federal agencies.

128.    Plaintiffs have collected "resource data" on open lands in Wyoming in support of petitions to list species under the Endangered Species Act. For example, NRDC has gathered data concerning whitebark pine on open lands in Wyoming, and has submitted that data to the U.S. Fish and Wildlife Service in support of a petition to list the species as threatened or endangered. Western Watersheds has collected data on the habitat of sage grouse and submitted that data to the federal government for use in

implementing the Endangered Species Act. Plaintiffs believe that additional species

inhabiting open lands in Wyoming merit listing under the Endangered Species Act and

wish to collect information concerning these species in support of listing petitions.

However, the Data Censorship Statutes deter Plaintiffs from doing so.

129.    The Federal Land Policy and Management Act, 43 U.S.C. §§ 1701-1787,

establishes the policy of the United States to manage public land "in a manner that will

protect the quality of scientific, scenic, historical, ecological, environmental, air and

atmospheric, water resource, and archeological values," *id.* § 1701(a)(8), and to ensure

that federal agencies "consider[] the views of the general public" when making land use

decisions, *id.* § 1701(a)(5). Agencies that implement the Federal Land Policy and

Management Act must allow and consider public input when developing, formulating,

and revising land use plans. *Id.* §§ 1712(f), 1739. The Data Censorship Statutes interfere

with the implementation of this law by imposing punishments on persons who collect

and communicate certain resource data to federal agencies. The Data Censorship

Statutes also interfere with the implementation of this law by imposing punishments on

persons who collect and communicate certain resource data to the public through their

publications, broadcasts, or other news media, if the public then forwards that data to

federal agencies.

130.    Plaintiffs have collected "resource data" on open lands in Wyoming and

submitted that data to the government to assist in developing, formulating, and

revising land use plans under the Federal Land Policy and Management Act. For example, Western Watershed has gathered information concerning the impacts of livestock grazing on uplands, riparian zones, and trout spawning in rural areas in Wyoming, and has provided that information to the BLM to support improved land use planning under this statute. Plaintiffs, their staff, and members desire to collect additional resource data from open lands in Wyoming to continue assisting federal agencies in generating and modifying land use plans under the Federal Land Policy and Management Act, but fear that doing so would result in criminal and civil liability under the Data Censorship Statutes.

131.     The National Forest Management Act, 16 U.S.C. §§ 1600-1687, requires the creation of comprehensive forest plans for each of the 156 national forests and grasslands. Consistent with this goal, Congress required the federal agencies that implement the National Forest Management Act to provide opportunities for and to consider public input when developing, formulating, and revising land use plans. *See* 16 U.S.C. § 1604(d). *See also* 36 C.F.R. pt. 218 (describing role of public participation in Forest Service's pre-decisional review process). The Data Censorship Statutes interfere with the implementation of this law by imposing punishments on persons who collect and communicate certain resource data to federal agencies. The Data Censorship Statutes also interfere with the implementation of this law by imposing punishments on persons who collect and communicate certain resource data to the public through their

publications, broadcasts, or other news media, if the public then forwards that data to federal agencies.

132.    Plaintiffs have collected "resource data" on open lands in Wyoming and submitted that data to the government to assist in developing, formulating, and revising land use plans under the National Forest Management Act. For example, Western Watersheds has gathered information concerning the impacts of livestock grazing on uplands, riparian zones, and trout spawning in rural areas in Wyoming, and has provided that information to the U.S. Forest Service to support improved land use planning under this statute. Plaintiffs, their staff, and members desire to collect additional resource data from open lands in Wyoming to continue assisting federal agencies in generating and modifying land use plans under the National Forest Management Act, but are deterred from doing so by the Data Censorship Statutes.

133.    The manner and extent to which federal agencies consider and rely on data, including data submitted to them by members of the public, is a question of federal law. Wyoming has no authority to direct how or whether federal agencies may consider data collected and submitted by citizen scientists.

134.    The Data Censorship Statutes prohibit the admission in administrative, civil, and criminal proceedings of certain resource data, other than in proceedings against a person alleged to have violated the Statutes. The Data Censorship Statutes do not purport to limit this prohibition to state proceedings. To the extent that the Data

Censorship Statutes purport to limit the admission of any resource data in federal

administrative, civil, and criminal proceedings, the Statutes are preempted.

135.    Plaintiffs and their members will suffer irreparable harm unless

Defendants are enjoined from enforcing Wyoming Statutes § 6-3-414 and § 40-26-101.

Plaintiffs have no adequate remedy at law and are entitled to injunctive and declaratory

relief on this claim.

## FOURTH CAUSE OF ACTION

## EQUAL PROTECTION

**[U.S. Constitution, amend. 14, sec. 1 (Equal Protection Clause); 42 U.S.C. § 1983]**

**[brought against all defendants except Todd Parfitt, as Director of the Wyoming Department of Environmental Quality]**

136.    Plaintiffs re-allege and incorporate by reference all allegations set forth

above.

137.    The Equal Protection Clause of the Fourteenth Amendment to the U.S.

Constitution provides that "No State shall . . . deny to any person within its jurisdiction

the equal protection of the laws."

138.    The Data Censorship Statutes make distinctions among persons who enter

open land without authorization. For example, the Statutes distinguish between persons

who collect resource data and those persons who collect other types of data. The

Statutes also distinguish between persons who provide information to government

agencies and persons who provide information to other recipients. The Data Censorship

Statutes do not prohibit unauthorized entry onto open land *unless* a person collects or

intends to collect resource data and the data is reported or intended to be reported to a

government agency.

139.    Wyoming's adoption of Wyoming Statutes § 6-3-414 and § 40-26-101 was

motivated in substantial part by animus toward environmental groups and their

activities to collect data that the government might use to make informed decisions in

applying duly enacted laws and in protecting the environment. While debating the

Statutes, Wyoming legislators: (1) expressed a specific concern that government

agencies would use resource data that had been reported to them by private citizens to

implement environmental laws in ways that were contrary to the interests of certain

private property owners; (2) stated that the legislation was an "extraordinary

measure[]" to prevent "egregious abuse of this collecting these water quality data"; and

(3) suggested that if private persons collected data about sage grouse (a species that the

federal government was considering for protection), that data might be used by

regulators to protect the species' habitat.

140.    During the legislative debates on the Data Censorship Statutes, Wyoming

legislators expressed open hostility toward the groups whose conduct the law targeted,

referring to them as "activist[s]," "extremists," "nefarious," and "evil." Wyoming

legislators who supported the Data Censorship Statutes indicated their disapproval of

persons, and the activities of persons, who gather and communicate information to the government for use in the enforcement and implementation of environmental laws.

141.    One reason the Wyoming Legislature adopted the Data Censorship Statutes was to deter and punish environmental groups from engaging in activity that would be lawful, but for the groups' reporting of, or intent to report, information to the government.

142.    Wyoming Statutes § 6-3-414 and § 40-26-101 violate the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

143.    Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment are secured under 42 U.S.C. § 1983.

144.    Wyoming Statutes § 6-3-414 and § 40-26-101 violate 42 U.S.C. § 1983.

145.    Plaintiffs and their members will suffer irreparable harm unless Defendants are enjoined from enforcing Wyoming Statutes § 6-3-414 and § 40-26-101. Plaintiffs have no adequate remedy at law and are entitled to injunctive and declaratory relief on this claim.

### Prayer for Relief

Plaintiffs respectfully request a judgment:

146.    Declaring that the challenged Statutes, Wyoming Senate File 12, Enrolled Act No. 61, 2015 Wyo. Sess. Laws ch. 146, *codified at* Wyo. Stat. § 6-3-414, and Wyoming

Senate File 80, Enrolled Act No. 82, 2015 Wyo. Sess. Laws ch. 183, *codified at* Wyo. Stat. § 40-26-101, on their face and as applied to Plaintiffs, violate—

    a.  the Petition Clause of the First Amendment of U.S. Constitution, as incorporated through the Fourteenth Amendment;

    b.  the Free Speech Clause of the First Amendment of U.S. Constitution, as incorporated through the Fourteenth Amendment;

    c.  the Supremacy Clause of the U.S. Constitution; and

    d.  the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

147.    Permanently enjoining Defendants, as well as their officers, agents, employees, attorneys, and all other persons in active concert or participation with them, from enforcing the challenged Statutes;

148.    Permanently enjoining defendant Todd Parfitt, in his capacity as Director of the Wyoming Department of Environmental Quality, from refusing to consider or to admit in any proceeding any resource data collected contrary to the Data Censorship Statutes, and permanently enjoining any expungement of such resource data;

149.    Compelling Defendants to provide public notice, including in the official and online editions of the Wyoming Statutes, that Wyoming Statutes § 6-3-414 and § 40-26-101 are unconstitutional and will not be enforced;

150.    Awarding Plaintiffs their reasonable attorneys' fees and costs; and

151.    Awarding such other and further relief as may be just and proper.

September 29, 2015                    Respectfully submitted,

*REED ZARS*

Reed Zars
Wyo. Bar No. 6-3224
Attorney at Law
910 Kearney Street
Laramie, WY 82070
(307) 745-7979
reed@zarslaw.com
*Counsel for Plaintiffs*

Justin R. Pidot, admission *pro hac vice* pending
University of Denver Sturm College of Law
    (for identification purposes only)
2255 East Evans Ave.
Denver, CO 80208
(303) 871-6000
jpidot@law.du.edu
*Counsel for Western Watersheds Project and*
*National Press Photographers Association*

Michael E. Wall, admission *pro hac vice* pending
Margaret Hsieh, admission *pro hac vice* pending
Natural Resources Defense Council
111 Sutter Street, 20th Floor
San Francisco, CA 94104
(415) 875-6100
mwall@nrdc.org; mhsieh@nrdc.org
*Counsel for Natural Resources Defense Council, Inc.*

Deepak Gupta, admission *pro hac vice* pending
Gupta Wessler PLLC
1735 20th Street, NW
Washington, DC 20009
(202) 888-1741
deepak@guptawessler.com
*Counsel for National Press Photographers Association*

69

Leslie A. Brueckner, admission *pro hac vice* pending
Public Justice
555 12th St., Suite 1230
Oakland, CA 94607
(510) 622-8205
lbrueckner@publicjustice.net
*Counsel for Western Watersheds Project*

Matthew Strugar, admission *pro hac vice* pending
PETA Foundation
2154 Sunset Blvd.
Los Angeles, CA 90026
(323) 210-2263
matthew-s@petaf.org
*Counsel for People for the Ethical Treatment of Animals, Inc.*

Justin F Marceau, admission *pro hac vice* pending
University of Denver Sturm College of Law
        (for identification purposes only)
Of Counsel, Animal Legal Defense Fund
2255 East Evans Ave.
Denver, CO 80208
(303) 871-6000
jmarceau@law.du.edu
*Counsel for Western Watersheds Project and National Press Photographers Association*

Paige M. Tomaselli, admission *pro hac vice* pending
Cristina R. Stella, admission *pro hac vice* pending
Center for Food Safety
303 Sacramento Street, Second Floor
 San Francisco, CA 94111
(415) 826-2770
ptomaselli@centerforfoodsafety.org
cstella@centerforfoodsafety.org
*Counsel for Center for Food Safety*

70